**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
ANDREW WOODSTOCK and SHARON
WOODSTOCK,

                                Plaintiffs,

                       -against-

DIRK KEMPTHORNE, SECRETARY UNITED
STATES DEPARTMENT OF THE INTERIOR,
and MARVIN E. MORIARTY, REGIONAL
DIRECTOR OF THE UNITED STATES FISH
AND WILDLIFE SERVICE,

                               Defendants.
-----------------------------------------------------X

                                      <u>**MEMORANDUM OF**</u>
                                      <u>**DECISION AND ORDER**</u>
                                      03 CV 0734 (ADS)

<u>**APPEARANCES**</u>**:**

**CHARLES R. PIERCE, JR., P.C.**
Attorneys for the Plaintiff
32 Woodbury Road
Huntington, New York 11743
        By:    Charles R. Pierce, Jr., Esq., of Counsel

**ROSLYNN R. MAUSKOPF**
**UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF NEW YORK**
Attorney for the Federal Defendants
610 Federal Plaza, 5th Floor
Central Islip, New York 11722-4454
        By:    Assistant United States Attorney Charles P. Kelly
                   Assistant United States Attorney Diane C. Leonardo Beckmann

**SPATT, District J.**

Andrew Woodstock and Sharon Woodstock (collectively, the "plaintiffs") commenced this action against Gale A. Norton, Secretary of the United States Department of the Interior, and Dr. Maimie A. Parker, Regional Director of the United States Fish and Wildlife Service (the "Service") (collectively, the "defendants") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  On May 26, 2006, Dirk Kempthorne succeeded Gale A. Norton as Secretary of the Interior.  Thus, Kempthorne has been automatically substituted as a party defendant and Norton has been removed from the caption.  <u>See</u> Fed. R. Civ. P. 25(d).  Similarly, Marvin E. Moriarty replaced Dr. Maimie A. Parker as the Service's Regional Director.

In this action, the plaintiffs seek review of the Service's final decision that denied, in part, the plaintiffs' request for a Special Use Permit ("SUP") for the purpose of reconstructing a dock, ramp, and float extending from the their property into the Oyster Bay National Wildlife Refuge (the "Refuge").  The plaintiffs seek an order setting aside the Service's factual findings and conclusions of law as arbitrary and capricious, and as inconsistent with the facts of the case.

There are presently two motions before the Court:  (1) the plaintiffs' motion for summary judgment pursuant to Fed. R. Civ. P. 56; and (2) the defendants motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) or, in the alternative, for summary judgment.

## I.      BACKGROUND

The plaintiffs reside at and own the property located at 453 Morgan Place, Centre Island, New York (the "Property").  The eastern boundary of the Property abuts the Refuge.  On the Property is a fixed wooden dock that extends from the edge of the Property approximately 100 feet into the Refuge (the "Dock").  The Dock existed in its current condition when the plaintiffs' purchased the property in or about 1998.

The parties agree that the plaintiffs' use of the Dock in its present form is limited because the Dock does not extend into deep water at all tides.  As such, the height of the dock in relation to the level of the water prohibits the plaintiffs from using the dock to engage in certain activities such as boating or swimming.  To better utilize the dock, the plaintiffs desire to extend its length by forty feet and to add a floating dock  (the "Float") at the end of the fixed dock.  The Float would be accessible from the end of the fixed dock via a gangway or ramp (the "Ramp").  The plaintiffs also proposed to replace the steel and concrete portions of their current dock with wood.

Because of the Refuge's protected status as a wildlife preserve, there are strict rules regarding construction within its boundaries.  According to the Service's policy regarding dock construction within the Refuge (1) there can be no new construction; (2) no construction of any kind can take place at all without prior permission in the

form of a Special Use Permit ("SUP") from the Local Refuge Manager; and

(3) permits will only issue for construction plans that meet certain established criteria.

**A.     The Service's Policy Regarding Dock Construction within the Refuge**

**1.     Development of the Policy**

On June 19, 1968, the Town of Oyster Bay deeded to the United States

Government the land comprising the Refuge.  Record ("R.") at 1-R.13.  The date of

this transfer in 1968 is the date of the formation of the Refuge.  Paragraph 3 of the

deed provides that:

> Should the premises or any part thereof, cease to be used solely [as an inviolate sanctuary for migratory birds and a refuge for fish and wildlife and their natural habitat in its natural state, except for scientific research or refuge management and subject to certain existing leases and agreements] . . . the entire estate hereby granted to the United States of America shall cease and determine, and shall forthwith revert to and vest in the Grantor.

R.2-R.5.  The Service interpreted this provision as requiring a reversion of the title of

the land comprising the Refuge to the Town of Oyster Bay if any new piers or docks

are constructed with the boundaries of the Refuge.  R.18.

On September 1, 1972, the Service established a written policy regarding

dock and pier construction and renovation in the Refuge.  R.19.  The policy

announced that:

> 1.     No new piers will be authorized in compliance with reservations of the deed of donation.

4

2.  Alteration and repair of existing legal piers may be authorized by Special Use Permit . . . .  The Special Use Permit should define the limits of alteration or repair to be allowed and any other special conditions, such as materials, time of construction, etc. which must be observed.

R.19 (first emphasis added).  About the time that this written policy of the Service was established, the Service conducted a visual survey of the size, characteristics, and condition of the thirty-three existing dock structures within the Refuge.  R.433-R.442.

In November 1989, the Service further clarified its policy by publishing a Decision Document which set forth a chart for Refuge managers to follow as a guideline as to whether an SUP should be granted (the "1989 Decision Document"). R.31.  In sum, the chart provides that no new permanent or floating docks would be permitted; all permanent and floating docks without permits would be removed; and construction could be done on existing permanent and floating docks if they had current permits, or if they were built before 1968, had all of the permits required in 1968, and remained useable at the time of the SUP application.  R.31.  The service did not define what condition a structure must be in for it to be considered "useable." R.31, R.532.

On March 10, 1993, a meeting was held at an office of the Service for the purpose of discussing issues concerning the Refuge.  R.49.  The Service's position regarding docks and other shoreline structures within the Refuge was discussed at this meeting.  The Service's policy, as recounted in a March 11, 1993 letter from an

environmental scientist to the Commissioner of Public Works for the Town of Oyster Bay, was that "only structures that were in place when the refuge was established in 1968 will be allowed to remain, provided that such structures have been continuously used and maintained from 1968 to the present." R.50. Also, "the Service would require the removal of all structures installed after 1968, and any pre-1968 structure that has been allowed to deteriorate beyond usability because of inadequate maintenance will not be granted a restoration permit." R.50.

On June 23, 1994, the Service completed a study regarding whether the existence and expansion of docks and piers within the Refuge was compatible with the purpose of the Refuge. R.53-R.55; see also 50 C.F.R. § 26.41 ("The Refuge Manager will not initiate or permit a new use of a national wildlife refuge or expand, renew, or extend an existing use of a national wildlife refuge, unless the Refuge Manager has determined that the use is a compatible use."). The Service expressed the results of that study in a "Compatibility Determination." The Compatibility Determination expressly reaffirms the Service's position that new docks are not permitted in the Refuge. R.54.

However, the Service recognized that when the Refuge was formed in 1968 there were an estimated thirty-three piers, fixed docks, and floating docks in the Refuge. These structures that existed at the time of the formation of the Refuge in 1968 were considered to be "grand-fathered" and allowed to remain. R.54. After

discussing several scientific studies considered in making its determination, the Service stated that the existence of docks within the Refuge was not compatible with the purpose for which the Refuge was established, e.g., for use as an "inviolate sanctuary . . . for migratory birds" and other wildlife in their natural state. R.53, R.55. Thus, the Service announced the following rules, among several others, to ensure that the continued existence of dock structures in the Refuge would be compatible with the purpose of the preserve: "1) no new docks may by permitted . . . [and] 4) all dock repair must be in-kind in nature and extent." R.55.

### 2.     Current Considerations Regarding SUP Applications

The Court has reviewed the administrative record and has not found an official statement embodying the Service's current policy regarding dock construction within the Refuge. Rather than a formal rule or statement, the Service's current practices appear to be based on a compilation of statements included in the historical policy documents and proceedings discussed above. Of the historical policy documents which form the basis of the criteria the Service currently considers in deciding SUP applications, the 1989 Decision Document is ostensibly the document most heavily relied upon, and it is the document most commonly referred to in the Service's later determinations.

The Service considers four criteria when determining whether to grant an SUP for dock construction within the Refuge. First, the structure to be repaired must have

"grandfathered" status.  This simply means that the structure must have existed in 1968 when the Refuge was formed.  R.54.  Second, the dock owner must submit an application to the Refuge Manager for permission to engage in the construction.  R.19.  The third and fourth criteria require that the dock be maintained in "useable" condition at the time of the application, and that the construction be limited to "in-kind" repair.  R.19, R.31, R.50, R.55.  These four criteria were recognized as constituting the Service's policy by the District Court in <u>Montero v. Babbit</u>, 921 F. Supp. 134 (E.D.N.Y. 1996), <u>aff'd</u>, 104 F.3d 356 (2d Cir. 1996).

Regarding the third and fourth criteria, the Court has found no official policy statement as to the definition of "useable" or "in-kind replacement."  However, the Court in <u>Montero</u>, 921 F. Supp. at 141-42, defined  "useable" as "structurally sound even if it does not extend into deep water at all times."

The administrative record is ambiguous as to a definition for "in-kind" replacement or repair.  The statement that "in-kind" does not include "additions to, major modifications of or replacement of historically existing structures" has appeared in the Service's determinations of SUP applications.  R.143, R.222, R.527.  Also, in its final determination regarding the plaintiffs' SUP application, the Service explains that "in-kind" is a "one for one" replacement of the structure as it existed at the time the SUP application was filed.  R.593.  On the other hand, the plaintiffs' argue that the "in-kind" requirement is less restrictive, in that the Service generally

permits reconstruction of docks within the dimensions that existed at the time of the

formation of the Refuge in 1968, so long as some portion of the dock remained

structurally sound at the time of the SUP application. <u>See</u> <u>Montero</u>, 921 F. Supp. at

141-42.

Last, it should be noted that the Service's method of determining what docks

existed and their dimensions at the formation of the Refuge in 1968 is not precise.

No physical measurements were taken at that time. In making its determination of

the dimensions and characteristics of a particular dock, the Service relied on visual

estimates recorded during a survey conducted in 1972, and on analysis of aerial

photographs of the Refuge taken before, about, and after the time of the formation of

the Refuge.

### B.    The Plaintiffs' SUP Applications

On June 6, 2001, the plaintiffs submitted a written application to the Service

for an SUP to engage in construction on their dock. R.119-R.120. The plaintiffs'

SUP application proposed to replace their 100 foot fixed dock, with no ramp or float,

with a 130 foot fixed dock with a ramp and four floating docks. R.120.

On July 2, 2001, the Service denied the plaintiffs' application for an SUP.

R.127. The Service determined that the plaintiffs' dock was grand-fathered as a 100

foot fixed structure, i.e. that it was 100 feet long at the time of the formation of the

Refuge in 1968, and that is the condition in which it has been maintained for the past

thirty years.  According to the Service, inasmuch as the plaintiffs sought to replace the 100 foot dock with a 130 foot dock and to add a ramp and floats, the plaintiffs' request was not for an "in-kind" repair or replacement of the dock.  R.127.

The decision to deny an SUP to the plaintiffs was upheld through a series of administrative appeals.  R.131-R.615.  At each subsequent review the Service found insufficient evidence that the plaintiffs' dock was longer than 100 feet at the time the refuge was created.  R.321.  The Service also found that the evidence submitted by the plaintiffs was insufficient to establish that a ramp and float ever existed.  R.321, R.143.  With regard to the ramp and float, the only evidence submitted by the plaintiffs was a letter from the nephew of a prior owner of the Property who claimed that he remembered the existence of a ramp and float "for a season or two" when he was a child more than 30 years ago.  R.222.  None of the aerial photographs submitted by the plaintiffs depict a ramp or float.  R.222.

Therefore, according to the Service, construction for anything more than a replacement of the currently existing 100 foot fixed dock that existed since 1968 would not meet the "in-kind" replacement policy.  R.138-R.140.  "In-kind replacement of a dock should consist of constructing the new dock of similar materials . . . of the same dimensions and number of pilings.  The footprint of a replacement dock should be no larger in dimension nor should there be any additional pilings."  R.139-R.140.

On February 13, 2003, the plaintiffs commenced this action. On August 28, 2003, the case was dismissed without prejudice so that the parties could conduct additional administrative review of the plaintiffs' applications. During the course of these proceedings the plaintiffs amended their SUP proposal several times. At issue here is the plaintiffs' SUP proposal in its final form, which requested permission to:

1.  Convert the existing 100' steel dock into a 100' wooden fixed dock;

2.  Convert the existing 10 concrete pilings into 18 wooden 12" diameter permanent pilings;

3.  Add a 40' section of wooden fixed dock to the reconstructed existing 100' fixed dock;

4.  Add 6 wooden permanent pilings of 12" diameter to support the new 40' section of wooden fixed dock;

5.  Add a seasonal 30' aluminum ramp;

6.  Add 2 seasonal 6' x 30' floating docks;

R.585. On March 26, 2004, the Regional Director of the Fish and Wildlife Service issued a final determination denying the plaintiffs' appeal. Regional Director Moriarty stated:

> Applicant's request to replace his 100' fixed dock that has had no ramp and float for over 30 years with a 140' fixed dock, 30' ramp, and 2 seasonal 6' x 30' floating docks is denied. Applicant is permitted to apply for an in-kind replacement of his 100' fixed dock. This reconsideration constitutes the FWS' final decision on Applicant's revised application.

R.610.

On May 28, 2004, the plaintiffs filed an amended complaint in this Court challenging the Service's final decision. The plaintiffs argue that the Service's denial of an SUP should be overturned because (1) their dock was 140 feet long, with a seasonal ramp and float, at the time of the formation of the Refuge in 1968, and (2) it is the Service's policy and practice to permit reconstruction of docks up to the dimensions that existed at the formation of the Refuge in 1968. The plaintiffs further contend that their proposal to replace their current fixed steel and concrete dock with a wood dock with wood piers is consistent with the Service's current standards for dock systems. With regard to the plaintiffs' last argument concerning the use of wood, the Service has already stated that it would not deny the plaintiffs the right to use this material. R.325. The issue of the proper material was not addressed in the Service's March 26, 2004 decision after reconsideration; and the Service does not raise a contrary argument now. Thus, the Court finds this issue to be moot and will not address it further.

Based on its review of the administrative record, the Court agrees that the Service's policy was to permit reconstruction based on the dimensions of the docks as they existed at the time of the formation of the Refuge in 1968. However, the Court also finds that the evidence in the administrative record is insufficient to vacate the Service's finding that the plaintiffs' dock was only 100 feet long with no ramp or float during the relevant period in 1968. Therefore, looking to the dimensions of the

plaintiffs' dock in 1968, the largest structure they would be permitted to construct today would be a 100 foot fixed dock with no ramp or float. Furthermore, for the reasons discussed below, the Service's earlier grant of an SUP allowing another owner to add a ramp and float that did not exist in 1968 does not render arbitrary and capricious the Service's denial to the plaintiffs of that same right.

## II.     DISCUSSION

### A.     The Administrative Procedures Act

In seeking review of the Service's decision the plaintiffs invoke the provisions of the APA. The APA provides, in relevant part, that "[a] person . . . adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. On review, the District Court may "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency decision is arbitrary and capricious if

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L .Ed. 2d 443 (1983); see also City of New York v. Shalala, 34 F.3d 1161, 1167 (2d Cir. 1994) (The Court must "consider whether an agency's decision

was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 103 S. Ct. 2856). "The Court is not permitted, however, to substitute its judgment on the wisdom of a rational policy alternative for that of the agency." Gill v. Paige, 226 F. Supp. 2d 366, 375 (E.D.N.Y. 2002) (citing Chevron v. Natural Res. Def. Council, Inc., 467 U.S. 837, 865-66, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)); City of New York, 34 F.3d at 1167).

In determining the plaintiffs' claim, the Court is limited to review of the administrative record, State of New York v. Evans, 162 F. Supp. 2d 161, 166-167 (E.D.N.Y. 2001), and the administrative determination will not be upset as arbitrary and capricious if there is a rational basis for the agency's decision in the administrative record. See Sierra Club v. U.S. Army Corps of Engineers, 772 F.2d 1043, 1050-51 (2d Cir. 1985) (stating a court "will uphold a decision of less than ideal clarity if the path which [the agency] followed can be discerned.") (citing Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S. Ct. 829, 836, 89 L. Ed. 1206 (1945); SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S. Ct. 1575, 1577, 91 L. Ed. 1995 (1947)); Natural Res. Def. Council, Inc. v. U.S. Nuclear Reg. Comm'n, 582 F.2d 166, 172 (2d Cir. 1978) ("What is required is that there be 'warrant in the record' and 'a reasonable basis in law' for the agency's determination."); Evans, 162 F. Supp. 2d at 166-67 ("The question for a court is not whether it agrees with the

decision of the [Agency], but whether the decision finds support in the administrative record.").

The Court may set aside an agency determination that is inconsistent with the agency's prior decisions and conduct if its reasons for its inconsistent conduct are not explained by the record. <u>See</u> <u>Motor Vehicle Mfrs. Assn.</u>, 463 U.S. at 41-42, 103 S. Ct. at 2866 (stating that "[a] 'settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies [of applicable statutes or regulations]' ") (quoting <u>Atchison, T. & S. F. R. Co. v. Wichita Bd. of Trade</u>, 412 U.S. 800, 807-808, 93 S. Ct. 2367, 2375, 37 L. Ed. 2d 350 (1973)); <u>see also</u> <u>Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.</u>, 125 S. Ct. 2688, 2699, 162 L. Ed. 2d 820 (2005). As a corollary to the broad discretion afforded to administrative agencies in establishing and applying their policies is the expectation that such policies will be applied evenhandedly. <u>See</u> <u>United States v. Diapulse Corp. of Am.</u>, 748 F.2d 56, 62 (2d Cir. 1984) (The government cannot " 'grant to one person the right to do that which it denies to another similarly situated.' ") (quoting <u>Marco Sales Co. v. FTC,</u> 453 F.2d 1, 7 (2d Cir. 1971)); <u>see also</u> <u>Airmark Corp. v. FAA</u>, 758 F.2d 685, 691 (D.C. Cir. 1985) ("Deference to agency authority or expertise . . . 'is not a license to . . . treat like cases differently.' ") (citation omitted).

However, the APA also recognizes that not all administrative mistakes result in prejudice. <u>See</u> 5 U.S.C. § 706 (In making its determinations the Court shall take

"due account . . . of the rule of prejudicial error."); <u>N.Y. Pub. Interest Research Group v. Whitman</u>, 321 F.3d 316, 333-34 (2d Cir. 2003) ("The rule of prejudicial error typically eliminates the necessity of remand following judicial review when the error that the agency has made was <u>not</u> prejudicial and did not impinge on fundamental rights.") (emphasis added); <u>Econ. Opportunity Comm'n, Inc. v. Weinberger</u>, 524 F.2d 393, 400 (2d Cir. 1975) (rejecting the argument that "any procedural infirmity results in arbitrary administrative action which must be set aside by a reviewing court"). This rule of "prejudicial error" is similar to the rule of harmless error. Thus, agency mistakes that "had no bearing on the procedure used or the substance of the decision reached" in the particular case at issue constitute harmless error under section 706 of the APA and do not warrant corrective measures. <u>N.Y. Pub. Interest Research Group</u>, 321 F.3d at 334 n.13 (quotation marks and internal citation omitted); <u>see also</u> <u>Sierra Club v. U.S. Fish and Wildlife Service</u>, 245 F.3d 434, 444 (5th Cir. 2001).

**B.     The Plaintiffs' Appeal**

In this case, the Service denied the plaintiffs' application for dock reconstruction based upon a finding that the proposal failed to satisfy its third and fourth criteria:  the plaintiffs did not have an "existing, usable dock of the kind [they sought] to construct."  R.582, R.605.  In other words, the plaintiffs' application and proposed construction plan included the addition of an extra 40 feet of fixed dock, a

ramp, and a float that did not exist in 1968 or at the time of the SUP application. The Service did determine that the plaintiffs would be permitted to reconstruct their dock at a length of 100 feet, without a ramp or floats, because this is the extent to which the dock existed in useable condition at the time of their SUP application. R.610.

The plaintiffs argue that these determinations were arbitrary and capricious because "there is no rational or plausible explanation for the denial of plaintiffs' permit given the evidence before Fish and Wildlife and their past practice and policy of granting permits within the refuge." Pls. Br. at 3.

### 1. As to the Applicable Standard

At the outset, having reviewed the administrative record, the Court finds that, historically, when considering SUP applications the Service's requirement that reconstruction be limited to the dimensions of the "original dock" referred to the dimensions of the dock as it existed at the time of the formation of the Refuge in 1968. R.761 ("In order to meet the [in-kind] requirement, the proposed aluminum ramp and float must be equal to or less than the original dimensions of the dock."). Under this rule, an applicant should be granted an SUP if they can establish that the dock they wished to construct existed in 1968 and that the dock was "useable," e.g. "structurally sound," at the time of the application. Montero, 921 F. Supp. at 141-42. This is not the standard that the Service applied to the plaintiffs' application.

In reviewing the plaintiffs' application, the Service required the plaintiffs to establish not only that the dock they wished to construct existed in 1968 and that it was currently "useable," but also to further establish that the dock existed in the dimensions which they sought to reconstruct at the time of the SUP application. R.143 ("Your appeal lacked documentation to confirm the presence of a functional ramp and float in 1968 <u>and</u> at the time of your March 1, 2001 request.") (emphasis added); <u>see also</u> R.221-R.222. As discussed below, even though the Service applied this different standard to the plaintiffs, that error was harmless because the Service also determined that the plaintiffs' dock existed in the same dimensions both in 1968 and at the time of their SUP application.

Regarding the different standard applied to the plaintiffs, the SUP applications of Christopher Pascucci and Arthur Altschul provide a helpful illustration. On December 30, 1998, the Service granted an SUP to Christopher Pascucci for the "[i]n-kind replacement of a fixed dock damaged during recent coastal storms." R.765. At the time of the SUP application, only 45 feet of Pascucci's dock remained. R.748. The SUP authorized the "replacement of a 110' long fixed dock, 3' x 25' aluminum ramp attached to the dock and a 10' x 10' floating dock." R.765. The administrative record is not clear as to when the original dock was destroyed. Although the SUP granted to Pascucci on December 30, 1998 states that the storms were "recent," the Court has found no other evidence in the record that this was the case. R.765.

In addition to applying for an SUP, dock owners must also secure local authorization. Pascucci applied for the necessary local permits. On August 27, 1999, the subject of the Pascucci dock reconstruction was discussed at a meeting of the Environmental Quality Review Commission of the Town of Oyster Bay. R.786. It was noted that "the Pascucci dock was not a reconstruction of an existing dock as stated on the application, but that the proposed [dock] was much larger than the existing [dock]. Despite that inconsistency . . . the Village had no objections to the permit application." R.788.

The Service argues that allowing Pascucci to reconstruct his dock beyond what existed at the time of his SUP application is not evidence that a different standard was applied to the plaintiffs application because Pascucci's dock was destroyed by a storm "immediately" prior to the time that he filed his application. R.323, R.324. There is evidence in the administrative record that the Service's policy permits reconstruction of recently destroyed or damaged docks. For example, on September 17, 1993, the Service granted an SUP to Mr. and Mrs. Robert Rose to reconstruct a dock that was destroyed in a December 11, 1992 storm to a length of 201 feet, with a 30 foot ramp and a 24 foot float. R.851, R.857. The Court has not found any clear evidence as to the length of the Rose dock immediately prior to the storm in 1992. The 1972 visual survey estimated the Rose dock at 150 feet with a 30 foot ramp and 20 foot float. R.844. Based on aerial photographs the Rose dock was

estimated to be 203 feet in 1966; 207 feet in 1969; 212 feet in 1972; 229.42 feet in 1976; 228.7 feet in 1980; and 216.939 feet in 1989.  R.562.

This situation was clarified in Montero v. Babbitt, 921 F. Supp. 134 (E.D.N.Y. 1996), in which Judge Hurley recognized that "the purpose underlying the [Service's] policy would not be compromised by permitting the reconstruction of a dock that was useable immediately prior to its sudden dismantlement through the ravages of nature."  921 F. Supp. at 141, aff'd, 104 F.3d 356 (2d Cir. 1996).  Thus, it was not inconsistent with its policy for the Service to permit the Roses to rebuild their recently damaged dock.  However, in contrast to the evidence regarding the Rose SUP application, the Court found no support in the record as to the date when Pascucci's dock was destroyed or that the Service ever inquired as to that date.  This leads the Court to believe that when reviewing applications in the past the Service was not concerned with the dimensions of the dock at the time of the SUP application as it claims to have been.

On June 1, 1999, the Service granted an SUP to Arthur Altschul for dock reconstruction.  R.793.  In doing so, the Service did not voice any objection to Altshul's proposal to add a float that no longer existed, nor did the Service inquire as to when the original float was lost.  R.793.  In granting the SUP application the Service was apparently satisfied that the float existed at the time of the formation of the Refuge in 1968.

The Court also notes that, on July 26, 2001, Altschul requested a permit modification seeking permission to widen his dock. Altschul was disabled and wheelchair bound, and sought to widen the first 138 feet of his dock from 4 feet to 5 feet, and to widen the remaining 12 feet of dock from 4 feet to 7 feet to allow for a seating area and turning room for his wheelchair. R.823, R.831. The Service denied this application for failure to satisfy the "in-kind" replacement requirement. R.831. In doing so, the Service's only apparent concern was that this was not how the dock existed at the time of the formation of the Refuge in 1968:

> Please adhere to your existing Special Use Permit to make in-kind repairs to the dock. If your client's fixed pier was 150' x 5' for the first 138' and the remaining 12' pier was 150' x 7' <u>in 1968</u>, please provide us with the documentation and we will be happy to review your request for modification.

R.832 (emphasis added). Altschul's dock clearly did not exist in the proposed wider dimensions at the time his SUP application was filed. The Service's apparent willingness to reconsider Altschul's SUP modification request if Altschul could demonstrate that the dock existed that way in 1968 supports the conclusion that the Service's policy was to limit dock construction to the dimensions of the dock at the time of the formation of the Refuge in 1968, without regard to the dimensions of the dock at the time that the SUP application was filed.

Thus, the Court finds that the Service's policy was to limit dock construction to the dimensions of the dock at the time of the formation of the Refuge in 1968. As

noted above, the Court believes that a different standard, which would limit dock construction to the dimensions of the dock to not only the 1968 dimensions, but also to the dimensions at the time of the SUP application, was applied to the plaintiffs. See supra at 17-18. Although the plaintiffs' SUP was evaluated under a different standard, the Court does not believe this differing treatment resulted in material prejudice to the plaintiffs. See 5 U.S.C. § 706; N.Y. Pub. Interest Research Group v. Whitman, 321 F.3d 316, 333-34 (2d Cir. 2003). This is because the Court also finds that the evidence is insufficient to vacate the Service's threshold determination that the plaintiffs' dock was 100 feet long with no ramp or float at the time of the formation of the Refuge in 1968. Even if the Service had used what the Court believes to be the correct standard in evaluating the plaintiffs' SUP application and looked exclusively to the dimensions of the dock at the formation of the Refuge in 1968, the plaintiffs' application to extend their dock by 40 feet and to add a ramp and a float would still have been denied.

**2. The Service's Determination that the Plaintiffs' Dock was 100 Feet with No Ramp or Float at the time of the Formation of the Refuge was not Arbitrary and Capricious**

The Service has found repeatedly during the administrative proceedings that the plaintiffs' dock was 100 feet long with no ramp or float at the time of the formation of the Refuge in 1968. R.127, R.138-R.139, R.170, R.579, R.606. Except

for one inconsistency as to the length of the dock in 1966, the Service's findings are rational and supported by the administrative record.

### a.    As to the Ramp and Float

The plaintiffs concede that none of the aerial photographs produced in this case show a ramp or float.  In support of their argument that a ramp and float existed at the time of the formation of the Refuge in 1968, the plaintiffs rely on a visual survey of the docks in the Refuge conducted in 1972, and a letter submitted by the nephew of the former owner of the plaintiffs' property.

In 1972, at or about the time the Service established its written policy regarding docks within the Refuge, the Service conducted a visual survey of the structures in the Refuge.  R.433-R.442.  The handwritten notations of this survey state that the plaintiffs' pier was 100 feet long, and that the "ramp and float [are] out for season."  R.110, R.440.

On April 16, 2002, in response to an inquiry from the plaintiffs, Bernard Caulfield wrote of his recollection of the plaintiffs' dock from the "early 1970s" when he had spent time on the property as a twelve-year old child.  R.444.  Caulfield is the nephew of the prior owner of the property.  In his letter, Caulfield states that:

> [he has] definite recollections of the pier [and] the floating dock . . . .
> [T]he pier had originally been longer and . . . [t]he furthest section
> had been badly damaged in a storm and when it was repaired it was
> shortened.

When my uncle first bought the house there was a floating dock and a ramp that went from the furthest end of the pier to the dock. It was not there for very long, maybe a season or two and had to be stored on land for the winter.

R.444.

The Court finds that the Service's position that this evidence is inconclusive as to the length of the dock or the existence of a ramp or float in 1968 is supported by the record. At best, this evidence establishes only that a ramp and float *may* have existed for some period in or about 1972 or the early 1970s, and not necessarily at the time of the formation of the Refuge in 1968. It could be the case that the ramp and float were installed in 1971 and remained through 1973. This scenario would be consistent with Caulfield's statements that the ramp and float were present in the "early 1970s" and that they were only there for "a season or two," but does not support a finding that the ramp and float existed in 1968. Caulfield's recollections are less than decisive, and his statements in the letter are not under oath nor is he specific as to dates. The letter speaks only to the possible condition of the dock in the "early 1970s," not the relevant time of the formation of the Refuge in 1968.

Regarding the visual survey, the surveyor's note that the ramp and float were "out for season" proves only that at the time the survey was conducted in 1972, there was no observable ramp and float, which might not have existed in 1968. R.110. This is not proof that any ramp and float in fact existed in 1968.

The Service contends that the surveyor's statement that the ramp and float were "out for season" was speculation, and chose not to afford significant weight to Caulfield's letter in the absence of other definitive evidence such as photographs, maps, or surveyor statements to substantiate that a ramp and float existed when the Refuge was established. R.606. The Court should not substitute its judgment for that of the Service in weighing and interpreting this evidence. The Service found that the plaintiffs' evidence was insufficient to establish the existence of a ramp and float at the time of the formation of the Refuge in 1968, and the Court has found no compelling reason in the administrative record to disturb that conclusion.

### b.      As to the Length of the Dock

The plaintiffs also contend that they have demonstrated that at the time of the formation of the Refuge in 1968, the dock extending from their property was approximately 140 feet long. Pls. Br. at 5. In support of this argument the plaintiffs refer to aerial photographs taken at on December 2, 1953, January 12, 1966, and April 11, 1969. R.419-R.426, R.953. All of these photographs were analyzed for the plaintiffs by licensed surveyor and professional engineer Charles Panetta. Based on his review of these photographs, Panetta opined that the plaintiffs' fixed dock was 140 feet long when the photographs were taken. R.419-R.426.

The Service concluded that the plaintiffs' contention that the dock was 140 feet long in 1968 was against the weight of the evidence. R.606. Apparently, the

Service had at one time agreed that the plaintiffs' dock was 140 feet long in or about 1966. R.321 ("The Service agrees the dock located at 453 Morgan Place, Centre Island, New York was estimated at 140 feet long in or around 1966 according to a scaled USGS photograph."). However, in the final determination regarding the plaintiffs' application the Service disagreed with this prior assessment of 140 feet when it stated that "[t]he longest estimate of Plaintiffs' dock was 108' in length in 1966 prior to the formation of the Refuge." R.596. This inconsistency is not explained.

The plaintiffs accuse the Service of "alter[ing] the original certified copies of the photographs submitted by the plaintiffs" to support its finding that the dock was not 140 feet long at the time of the formation of the Refuge. Pls. Br. at 22. Relying on a letter from Charles Panetta, the plaintiffs' claim that the Service "attached a note to the 1966 photograph claiming that plaintiffs' dock was only 108 feet." Id.; R.419-R.420. Presumably, the plaintiffs infer that because a written note was attached to the photograph indicating that the plaintiffs' dock, represented in the photograph, was only 108 feet long anyone intending to estimate the length of the dock based on the photograph would rely on the information written on the note rather than make an independent determination of the length of the dock.

The Court finds that this accusation of an alteration is unpersuasive. First, the photograph that Panetta references as having had a note attached to it was from the

year 1953, not 1966 as the plaintiffs contend.  Second, Panetta states only that he believes the photograph was analyzed incorrectly and not that the photograph was altered.  R.419.

Whatever the reason for the inconsistency in the Service's factual findings, the Court finds that it does not render the final decision of the Service arbitrary and capricious.  The critical time period in this case is 1968.  Despite the one contradictory statement by the Service on this matter, it has otherwise been consistent in finding that the plaintiffs' dock was not longer than 100 feet long in 1968.  See, e.g., R.127, R.138-R.139, R.170.

Viewing the administrative record as a whole, the Court finds that there was a basis in fact for the Service's final determination.  See New York Council, Ass'n of Civilian Tech. v. Fed. Labor Relations Auth., 757 F.2d 502, 508 (2d Cir. 1985) (requiring only that there be a "rational connection between the facts found and the choice made.") (citation omitted); see also Natural Res. Def. Council, Inc. v. U.S. Nuclear Reg. Comm'n, 582 F.2d 166, 172 (2d Cir. 1978).  The Court finds some evidence in the administrative record that supports the plaintiffs' position that the dock could have been 140 feet in 1966 through 1969.  Especially the fact that the Service at one point agreed that the plaintiffs' dock was 140 feet long in 1966, see supra 26; R.321, but has since changed its position.

However, in making its final determination following reconsideration of the plaintiffs' application, the Service was presented with the plaintiffs' evidence and chose not to credit it over other evidence. Instead, the Service relied on its own analysis and the opinion of other contractors. See, e.g., R.579 (estimating the length of the plaintiffs' dock as 104 feet long in 1969). It would not be appropriate for the Court to weigh this conflicting evidence in an effort to reach an independent conclusion regarding the length of the plaintiffs' dock at the time of the formation of the Refuge in 1968, and then to substitute its judgment for that of the Service. See Gill v. Paige, 226 F. Supp. 2d 366, 375 (E.D.N.Y. 2002) (citing Chevron v. Natural Res. Def. Council, Inc., 467 U.S. 837, 865-66, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)).

**3.    The Service's Denial of an SUP to the Plaintiffs is not Inconsistent with its Past Practices**

As noted above, an agency determination may be found to be arbitrary and capricious on the basis of unexplained inconsistency with prior conduct. See Motor Vehicle Mfrs. Assn., 463 U.S. at 41-42, 103 S. Ct. at 2866; Diapulse Corp., 748 F.2d at 62. The Court has reviewed the administrative record in this case, and finds the evidence insufficient to establish that the Service's denial of an SUP to the plaintiffs was so inconsistent with its past practices as to render arbitrary and capricious the Service's final determination of the plaintiffs' application.

From the time that the Service issued the 1989 Decision Document, the Service has determined fifty-six SUP applications submitted by twenty-five dock owners. R.611-R.615. In all, thirteen SUPs were granted, amounting to roughly half of the dock owners who applied. There is evidence that on one occasion the Service permitted an owner, Charles Wang, to add structures to his dock that did not exist at the time of the formation of the Refuge in 1968. The plaintiffs do not cite to any other evidence that clearly establishes that the Service otherwise failed to adhere to its policy of permitting reconstruction within the dimensions of the original dock.

On April 18, 1991, the Service granted an SUP to Charles Wang for the purpose of not only replacing his existing structure, but also to add a "6' by 50' floating dock." R.666. The plaintiffs claim that this SUP permitted Wang to extend the dock past the point where it existed at the time of the formation of the Refuge in 1968, and to add floats that did not exist at the time of his application. With respect to the length of the dock, the plaintiffs are mistaken. In this regard, Wang's first four applications were denied because he sought to extend his dock beyond the then currently existing 125 feet, which was apparently also the length of the dock in 1968. R. 562, R.616, R.651. In fact, it appears that Wang's replacement fixed dock was only approximately 114 feet long. R.655, R.666, R.675.

The Service admits that Wang was allowed to add a ramp and float that did not exist at the time of the formation of the Refuge in 1968. As noted above, Wang

submitted four prior unsuccessful SUP applications.  On or about November 13,

1990, Wang withdrew his appeal of the Service's most recent denial of a permit and

agreed to submit a revised proposal limiting the construction to "the in-place

refurbishment of the existing fixed dock" and the "installation of approximately 100

feet of seasonally removable floating docks."  R.651.

The administrative record contains no evidence as to why the Service

permitted Wang to add the floating dock.  The Service attempts to justify this

departure from its policy as an exception permitted during a claimed "phase-in"

period of a "new" policy.  R.598.  The Service states in its final order denying the

plaintiffs' SUP application that:

> The basis for the decision [to grant an SUP to Wang] was a
> compromise between implementing the new policy and administering
> a phase-in period for the Decision Document that changed how
> structures would be permitted. . . .  The [Service] did not intend the
> Wang decision to serve as standard operating procedure, but rather,
> a reasonable approach to phasing in a major new policy.

R.598.  The Court finds this explanation to be evasive and in the nature of after-the-

fact reasoning conceived in an attempt to explain a non-conforming treatment of an

SUP application.

First, the Service's policy was not "new" at the time of the Wang application.

The policy was in place since at least 1972, so that it had been in operation for

seventeen years when the Decision Document was published and almost twenty years

when the Service reversed its position and granted the Wang application.  R.19.  Nor

is the Court convinced that the 1989 Decision Document constituted a "major new policy" rather than a mere clarification of a long standing policy. R.31. Second, even if the Court were to accept that the 1989 Decision Document constituted a "new" policy, the only mention of a phase-in period or compromise is found in the denial of the plaintiffs' application. R.598. The Court finds no other support in the administrative record indicating that there was actually a phase-in period.

Unfortunately, it appears that those persons who were employed by the Service at the time of the final Wang SUP application and vested with discretion in these matters in 1991 failed to adhere to the Service's stated policy. If any action in this case was arbitrary, the Court believes that it was the Service's grant of an SUP permit to Wang to add a ramp and float that did not exist at the time of the formation of the Refuge in 1968. The Court finds the Service's explanation for having done so unsupported by the administrative record.

However, this one prior departure from policy, in the face of the substantially consistent application of Service policy to the many SUP applications filed in the twelve years following the grant of the Wang SUP, does not render the current determination regarding the plaintiffs' application arbitrary and capricious. It would be a violation of well-settled administrative law rules if one questionable departure could form the basis for a ruling that all subsequent determinations were arbitrary and capricious. Accordingly, the plaintiffs' motion for summary judgment is denied, and

the defendants' motion for judgment on the pleadings affirming the final

determination of the Regional Director of the United States Fish and Wildlife Service

is granted.

### III.    CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the Clerk of the Court is directed to amend the caption to

read as follows:

---------------------------------------------------------X
ANDREW WOODSTOCK and SHARON
WOODSTOCK,

                           Plaintiffs,

          -against-

DIRK KEMPTHORNE, SECRETARY UNITED
STATES DEPARTMENT OF THE INTERIOR,
and MARVIN E. MORIARTY, REGIONAL
DIRECTOR OF THE UNITED STATES FISH
AND WILDLIFE SERVICE,

                         Defendants.
---------------------------------------------------------X ; and it is further

**ORDERED**, that the plaintiffs' motion for summary judgment reversing the

final decision of the Regional Director of the United States Fish and Wildlife Service

is DENIED; and it is further

**ORDERED**, that the defendants' motion for judgment on the pleadings

affirming the final decision of the Regional Director of the United States Fish and

Wildlife Service and dismissing the amended complaint is GRANTED; and it is

further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED**.

Dated: Central Islip, New York
　　　　August 22, 2006

　　　　　　　　　　　　　　　　　　　　*/s/ Arthur D. Spatt*　　　　
　　　　　　　　　　　　　　　　　　　　ARTHUR D. SPATT
　　　　　　　　　　　　　　　　　　　United States District Judge